UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN DALE LUHR,

       Plaintiff,

  v.

NANCY A. BERRYHILL,

       Defendant.

Case No.17-cv-00686-EDL

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 19

On February 10, 2017, Plaintiff Kevin Luhr filed this lawsuit pursuant to 42 U.S.C. Section 405(g), seeking judicial review of the Commissioner of Social Security's decision to deny his application for Disability Insurance Benefits under Title II of the Social Security Act. For the following reasons, the Court GRANTs Plaintiff's motion for summary judgment, DENIES Defendant's cross motion for summary judgment, and remands for further proceedings to consider the impact of Plaintiff's treating physician Dr. Stone's medical opinion on the ALJ's disability determination.

## I.    BACKGROUND

Plaintiff was fifty five years old at the time of his alleged disability onset. AR 151-57. He worked as a sheet metal worker from 1978 through September 2004, at which time he stopped working due to a back injury. AR 163, 223. He sought benefits based on the following alleged disabilities: spondylolisthesis L4-5, degenerative disc, stenosis L5-S1, constant pain, hardware in lower back, left foot numbness, left buttcheek numbness, lack of sleep, fatigue, high blood pressure, and heart attack in 2000. AR 162.

### A.    Procedural History

Plaintiff filed his application for disability benefits on April 4, 2013. AR 69, 143-46. He

initially claimed that he became disabled on January 1, 2013, but later amended his onset date to April 12, 2009. AR 11, 143. His last insured date was September 30, 2010. AR 31. His application was denied on July 30, 2013 and upon reconsideration on November 19, 2013. AR 80-84, 86-90. He requested a hearing with an administrative law judge ("ALJ"), and the ALJ held a hearing on April 9, 2015. AR 24, 94-95. The ALJ issued an unfavorable decision on July 14, 2015. AR 11-19. On December 16, 2016, the Appeals Council denied Plaintiff's request for review of the unfavorable decision, and the ALJ's decision became final on that date. AR 1-3.

Plaintiff moved for summary judgment, asking the Court to reverse the final decision of the Commissioner and order the payment of benefits, or alternatively to remand for a new hearing before an ALJ. Dkt. No. 15. Defendant filed a combined opposition and cross motion for summary judgment. Dkt. No. 19.

### B. Plaintiff's Medical History

#### 1. Eldan Eichbaum, M.D. (treating physician)

On October 23, 2004, Eldan Eichbaum, M.D. performed an L5-S1 hemilaminotomy and discectomy on Plaintiff AR 226. The day prior to his surgery, an MRI scan of his lumbar spine showed moderate disk degeneration in L5-S1 with a large disk extrusion on the left at L5-S1 with caudal migration, causing severe stenosis and S1 nerve root compression. AR 224. The formal diagnosis was left S1 radiculopathy secondary to L5-S1 disk extrusion, with an ancillary diagnosis of coronary artery disease. AR 244. Dr. Eichbaum's notes indicate that Plaintiff complained of severe left leg pain, likely caused by the disk herniation at L5-S1 with extrusion. AR 225. He noted that Plaintiff experienced this progressively worsening pain over the previous month, despite medical management. AR 224. Dr. Eichbaum offered two treatment plans, including surgery or ongoing pain management with physical therapy and lumbar epidural injections. AR 224. Plaintiff chose surgery. AR 224. At the time of discharge after the surgery on October 26, 2004, Dr. Eichman noted that "[p]ostoperatively, [Plaintiff's] left leg pain was improved significantly." AR 233. He noted that Plaintiff "began to ambulate well on the second and third postoperative days," although he continued to experience persistent numbness in his left foot, which the doctor expected to improve postoperatively. AR 233. At discharge he was prescribed

Narco for pain and Valium for muscle spasms.  AR 245.

Plaintiff testified that he continued to see Dr. Eichman for six or seven months following his surgery, but there are no records memorializing those visits.  AR 32.  Plaintiff testified that he was unable to obtain those records because Dr. Eichman moved to a different practice and Plaintiff's medical records were destroyed after seven years.  AR 50.

### 2.     Treating Physicians between 2004 and 2010

The administrative record has few medical records from the period between 2004 and 2010.  Records indicate that Plaintiff received primary care from Steven Olson, M.D. (AR 243, 286, 288); Nicholas Anton, M.D., (AR 275, 280); Nidhi Johri, M.D. (AR 278); David Begert, M.D. (AR 282, 284).  The administrative record does not contain these doctors' records relating to Plaintiff's care, although Plaintiff testified that he saw his treating primary care physicians about once a year regarding the back and leg pain he experienced.  AR 32-33.  Plaintiff has not offered any explanation for why he did not obtain these primary care physicians' records.

John Hunter, M.D. (treating physician) was Plaintiff's treating cardiologist. AR 278-91, 309-15.  Dr. Hunter diagnosed Plaintiff's heart attack in 2000 and subsequently performed a left heart catheterization, left ventricular angiography, and right and left coronary arteriography.  AR 312-13  In 2006, Dr. Hunter noted that Plaintiff was "doing well, active, having recovered from his back surgery," although a few months earlier he had observed that Plaintiff "still hass [sic] neuropathy symptoms in his lateral left leg, ever since the back surgery."  AR 285-86.

David Fraser, M.D., provided a carotid duplex report for Plaintiff on October 15, 2007, based on a referral from Dr. Anton.  AR 292.  Paul Hornberger, M.D., conducted a colonscopy on Plaintiff on October 29, 2007.  AR 306.

### 3.     James Stone, M.D. (treating physician)

James Stone, M.D., treated Plaintiff for back and leg pain from February 16, 2010 to at least December 24, 2013.  AR 320-22, 339, 618-21.  The medical records from Dr. Stone are limited.  However, on December 24, 2013, Dr. Stone completed a lumbar spine medical source statement for Plaintiff.  AR 618-21.  Dr. Stone summarized his contact with Plaintiff as four visits total starting on February 16, 2010.  AR 618.  He noted that Plaintiff's diagnoses were chronic low

back pain, coronary artery disease with stenting.  AR 618.  He noted that Plaintiff's symptoms were constant lower back pain and numbness in his left foot, with leg and foot pain of varying severity.  AR 618.

Dr. Stone provided the following functional assessment of Plaintiff based on four visits between February 2010 and December 2013:  Plaintiff can walk one city block; sit or stand for 45 minutes at one time; sit, stand, or walk for four hours in an eight-hour work day; requires a job that permits shifting positions at will from sitting, standing, or walking; and needs to take walk breaks of five minute durations every thirty minutes; take unscheduled work breaks every 1-2 hours.  AR 619-20.  He further noted that Plaintiff can never lift 50 pounds, rarely lift 20 pounds, and occasionally light 10 pounds or less.  AR 620.  He should never crouch or squat, rarely stoop, and occasionally twist, climb ladders, and climb stairs.  AR 620.  He estimated that Plaintiff was likely to be off task 25% or more of a typical workday.  AR 621.  He stated that the stated symptoms and limitations apply back to 2004.  AR 621.

Additional records indicate that Dr. Stone saw Plaintiff at least twenty times between 2012 and 2014 for other reasons.  AR 348, 349, 350, 351, 352, 359, 376, 377, 624, 630, 640, 643, 661, 669, 670, 671, 674, 676, 677, 679.  However, none of these additional records expressly concerned Plaintiff's complaints of back or leg pain.

### 4.     Tracey Anne Jones, M.D. (treating physician

Plaintiff began seeing Tracey Anne Jones, M.D., in February 2013 for his back and leg pain.  AR 328.  Dr. Jones diagnosed him with lumbar radiculopathy (pinched nerve in the back), which causes left leg pain, as well as chronic lumbar spinal stenosis.  AR 328.  She said the chronic lumbar spinal stenosis can cause low back and leg pain with standing and walking.  AR 328.  She recommended treating the pinched nerve with lumbar epidural steroid injections.  AR 328.  After receiving the steroid injection, Plaintiff reported that he was relieved of pain for a couple of days, but the pain returned again and "[t]he shots are not the answer."  AR 330.  On March 28, 2013, Dr. Jones responded that he could try a steroid injection that targeted a larger area including the stenosis at L4/L5 or he could speak with a spine surgeon.  AR 331.  Plaintiff chose to seek the expertise of a spine surgeon and noted that someone had recommended Donald

4

Matthews, M.D., to him.  AR 332-33.

### 5.     Donald Matthews, M.D. (treating physician)

Dr. Matthews began treating Plaintiff for back and leg pain on April 3, 2013 and continued treating him through November 8, 2013.  AR  369, 617.  Dr. Matthews diagnosed Plaintiff with degenerative, acquired spondylolisthesis L4-L5, spinal stenosis with neurologic signs at L4-L5 and potentially L5-S1, degenerative disc disease low back L5-S1, and lumbar post-laminectomy syndrome left L5-S1.  AR 383-85.  Dr. Matthews' notes explain that Plaintiff suffered an injury on January 1, 2013, from moving a 24 foot long cedar wood long, which caused left leg and left lower back pain.  AR 383.  Dr. Matthews' summary states that Plaintiff has had persistent left foot numbness since before his first back surgery in 2004 and lower back pain since 2005.  AR 383. Dr. Matthews performed a lumbar laminectomy with fusion on Plaintiff on April 11, 2013.  AR 413.

In follow-up notes from a visit with Plaintiff on July 16, 2013, Dr. Matthews noted that Plaintiff's sensation was intact and he had "active movement against full resistance without fatigue (normal strength)."  AR 614.  He also noted that Plaintiff was "[r]ecovering slowly" and recommended continuing with physical therapy, that his prognosis indicated a good recovery so far, and his symptoms were expected to last for about six months.  AR 615-16.

On November 8, 2013, Dr. Matthews wrote a letter stating that Plaintiff is "a candidate for long term permanent disability of his lumbar spine and back problems" and he was "likely not [to] see any better resolution of his back pain/condition."  AR 617.  The opinion noted that Dr. Matthews performed a spinal fusion L4-S1 on Plaintiff in April 2013 and Plaintiff has had "persistent back pain and leg pain since the spinal fusion."  AR 617.  He further noted that Plaintiff is "markedly limited in all his activities," walks with a cane at all times, can only walk 100 yards at best, and suffers from "chronic debilitating back pain."  AR 617.  To help him get through each day, Dr. Matthews stated that Plaintiff requires narcotic analgesics of high dose and strength.  AR 617.  He did not make any assessment of Plaintiff's past limitations but only used current ones.

5

### C.     ALJ Hearing

#### 1.     Plaintiff's Testimony

Plaintiff testified at the April 9, 2015 hearing.  He stated that he graduated from high school.  AR 29.  Although he has had some earnings in the meantime, his last substantial employment was in October 2004 as a sheet metal mechanic for a heating and air conditioning company.  AR 29, 56.  He did not perform precision work in his job in his job as a sheet metal mechanic and he used mostly hand tools and was often on a ladder.  AR 56-57.  He does not use a computer.  AR 56.  He was paid in 2009 and 2010 for some maintenance work he completed for a friend's property management business, but he testified that he could not continue that work because he was not physically capable of it.  AR 29.  He explained that that work included light maintenance such as painting, changing faucets, and hanging light fixtures.  AR 29.  During that time, he also owned a rental home on which he earned some income.  AR 30.

Because Plaintiff alleged an onset date of 2004 and his last insured date was September 30, 2010, the ALJ's questions and Plaintiff's testimony focused on the period from 2004 to 2010.  The ALJ asked Plaintiff to discuss the medical treatment he received after his back surgery to remove a disc in 2004.  For two weeks prior to his surgery, which he described as a "discectomy" where a disc was removed from between his vertebrae, Plaintiff had not been able to walk.  AR 54.  After two weeks in bed, Plaintiff visited the emergency room and surgery was performed on his back the next day.  AR 54.  Plaintiff had a second surgery after he reinjured his back in January 2013.  AR 55.

After the first surgery, Plaintiff testified that he attended regular follow-up visits with Dr. Eichbaum who performed the surgery for approximately six or seven months.  AR 32.  He also attended physical therapy for approximately one year.  AR 32.  After he stopped seeing Dr. Eichbaum, he continued to see his primary care physician for back issues approximately once a year.  AR 32-33.  One time he visited doctors at the Santa Rosa Memorial Clinic with complaints of back pain.  AR 33-34.  He has also visited the emergency room a number of times for his back.  AR 42.

After his back surgery, he continued to experience daily back pain, as well as sciatica

United States District Court
Northern District of California

where the pain radiated from his back down his left leg. AR 34. On those occasions when he visited other physicians after he stopped seeing Dr. Eichbaum, he was prescribed pain medication. AR 33. He has taken Neurontin for muscle spasms, and Elavil, Valium, and Toradol for pain. AR 33. Neurontin caused him to feel "loopy" and he only took that medicine for a few weeks. AR 37. He did not experience side effects from the other medications he was prescribed. AR 37. He testified that these medications helped with the pain in his back, but they did not alleviate the pain in his left leg. AR 34-35. He further testified that he did not receive treatment for his leg pain, except his second surgery in 2013. AR 35. That surgery provided some relief from the leg pain so that it is not a daily occurrence. AR 36. However, his sciatica was aggravated in February 2013 when he was attempting to move a wood log. AR 38.

He explained that his injuries have limited his ability to move normally. He testified that he does not walk well anymore and his leg pain can be aggravated by standing too long or walking any distance. AR 39. He also has trouble sitting for longer than thirty minutes. AR 44. He said that he cannot bend over well and sometimes he is forced to crawl on the ground rather than try to stand up and walk. AR 39. He has used a cane to walk since his first surgery in 2004. AR 39. He does not use the cane inside his home often because he walks around with the assistance of furniture and he uses a walking stick around the yard and house, but he uses the cane every day. AR 40. He testified that he had trouble sleeping from 2004 to 2010, when he would only have about four hours of restless sleep from the pain he was experiencing, but he did not take any sleep aids. AR 45.

Plaintiff also testified to the way his back and leg pain impacted his activities of daily living. He explained that he could dress and bathe himself, but he had trouble bending over to put on his socks and shoes and often required the help of his wife. AR 46. He was able to continue doing the laundry, cooking, and light grocery shopping, but he could no longer complete some household chores like sweeping or mopping. AR 46-47.

In 2010, Plaintiff had a heart attack, which treated with a stent. AR 42-43. In response to questions from his attorney, Plaintiff also testified about a 2008 cardiology report. The report noted that he spent most of the summer of 2008 remodeling a house. AR 51. Plaintiff testified

7

that the project was updating a home for his daughter, which generally involved cosmetic changes, like painting and replacing faucets and light fixtures. AR 51-52. Plaintiff did some of the labor on the remodel, like painting, but he mostly oversaw the work on a daily basis. AR 52. The report also noted that he kayaked frequently during the summer of 2008. AR 52. Plaintiff explained that sitting in the kayak and paddling on the lake is an activity he can manage, as compared to biking which he could no longer do. AR 52. The report also stated that he cut firewood, but Plaintiff testified that he only carried two or three pieces into the house at a time and never cut the wood himself. AR 53.

### 2. Vocational Expert Testimony

During the first ALJ hearing on April 9, 2015, David Bentmore, a vocational expert, testified. Mr. Bentmore classified Plaintiff's work as a sheet metal worker (DOT number 804.281-010), SVP 7, medium. AR 58. The ALJ asked Mr. Bentmore if the job involved transferrable skills. Mr. Bentmore testified that it did not because the job is very basic and specific in its duties even though it is classified as an SVP 7 job. AR 59.

The ALJ asked Mr. Bentmore to consider a hypothetical of Plaintiff's age, education and work background. AR 59. This hypothetical individual could lift and carry 50 pounds occasionally and lift and carry 25 pounds frequently. AR 59. The individual was limited to sitting, standing, and walking six hours in an eight hour day. AR 59. He could engage in frequent climbing, balancing, stooping, kneeling, crouching, and crawling. AR 59. Mr. Bentmore testified that this hypothetical individual could perform Plaintiff's past work as a sheet metal worker. AR 59.

The ALJ then asked him to consider the same hypothetical person with an additional limitation of only occasional pushing and pulling with the left lower extremity. AR 59. Mr. Bentmore testified that the hypothetical person could still perform Plaintiff's past work. AR 59. He testified, however, that the same hypothetical person could not perform that work if he were to be absent from work more than four times a month. AR 59.

Plaintiff's representative asked Mr. Bentmore about some additional hypotheticals. Taking all limitations from the second hypothetical, except being absent more than four times a month,

she added the additional limitations of no ladders, stooping rarely, never crouching and squatting, with a sit-stand option with access to an ergonomic chair but never a stool. AR 60. In addition, this hypothetical person needed access to his cane at all times. AR 60. Mr. Bentmore testified that this hypothetical person could not perform Plaintiff's past work as a sheet metal worker. AR 60. However, he listed two alternative jobs that this hypothetical person could perform. First, he could perform the job of office helper (DOT number 239.567-010), which is light work. AR 60. Second, he could perform the job of information clerk (DOT number 237.567-018), which is sedentary work. AR 60. He noted that there are about 85,000 sedentary, unskilled jobs in the United States that this hypothetical person could perform. AR 60.

### D.    ALJ Decision

#### 1.    Step One -- Substantial Gainful Activity

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the date of his alleged disability onset on April 12, 2009 through his date last insured of September 30, 2010. AR 13.

#### 2.    Step Two -- Severe Impairment(s)

At step two, the ALJ found that Plaintiff has the following severe impairment: status post lumbar fusion. AR 13.

#### 3.    Step Three -- Listed Impairment(s)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. The ALJ determined that the status post lumbar fusion impairment does not meet or equal listing 1.04, Disorder of the Spine, because Plaintiff's condition does not result in pseudoclaudication, is not manifested by chronic nonradicular pain and weakness, and does not result in the inability to ambulate effectively. AR 14.

#### 4.    Step Four -- Past Relevant Work

At step four, the ALJ determined that Plaintiff is capable of performing past relevant work as a sheet metal worker. AR 18-19. In reaching that conclusion, the ALJ considered Plaintiff's residual functioning capacity ("RFC"), and found that he has the capacity to perform medium

work as defined in 20 C.F.R. Part 404.1567(c), with some exceptions. AR 14-18. He concluded that the additional limitations were that Plaintiff can lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand, or walk six hours of an eight-hour workday; occasionally push and/or pull with the left lower extremity; and frequently climb, balance, stoop, kneel, crouch, and crawl. AR 14.

Although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, she also found that Plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were not entirely credible for reasons set forth in her decision. AR 15-17. To start, she found that his alleged symptoms were belied by the underlying medical records. AR 15. She notes that he first underwent back surgery in 2004, after which he saw his treating surgeon for six or seven months, although the medical records no longer exist. AR 15. Although he testified that he continued to experience pain, he did not seek any medical treatment for the pain. AR 15. It was not until February 2013 that he sought treatment again and only after he reinjured his back while moving a log. AR 15. Moreover, once he did seek treatment in 2013, he declined to continue pursuing his doctor's initial treatment plan of steroid injections and instead sought the advice of a spinal surgeon. AR 15. His surgeon, Dr. Matthews, diagnosed him with degenerative acquired spondylolisthesis at L4-L5 with spinal stenosis and neurologic signs at L4-L5 and degenerative disc disease of the lower back, and Dr. Matthews performed a lumbar fusion on his spin on April 11, 2013. AR 16. After his second surgery in 2013, an MRI of Plaintiff's lumbar spine indicated that there were post-surgical changes with associated scar tissue and a severe degree of acquired spinal stenosis, but the record does not address laterality and nerve root distribution of concern. AR 15. During his hospital stay after surgery in 2013, his physical therapy notes state that his motion was within normal limits and he demonstrated good functional strength even though his tolerance to mobility was limited by pain. AR 16. His final physical therapy session before discharge indicate that he experienced minimal pain increase with exercise and gait distance increase. AR 16. He and his wife declined further physical therapy sessions after he was discharged. AR 16.

After his surgery during a follow-up visit, Plaintiff indicated that he overexerted himself

during his physical therapy exercises, but he stated that his left leg pain was resolved and he rated his back and leg pain as a three out of ten. AR 16. Post-operative x-rays showed that his condition was stable. AR 16. Dr. Hunter reported in December 2014 that Plaintiff's condition was much improved and he continued to see him for his condition only once a year. AR 16.

Moreover, the ALJ noted that Plaintiff has only been prescribed three medications for his pain, extreme pain, and muscle spasms, but he tries to not take the medicine for extreme pain. AR 16. The record also only includes physical therapy notes from one session after his 2013 surgery, which indicates that he had an antalgic gait on the left lower extremity without a cane, but normal limits of strength despite a weak core. AR 16. He complained of some pain, but did not follow up for further physical therapy. AR 16.

The ALJ found that Plaintiff's credibility was further diminished because of some inconsistencies she identified in his statements in the record. For example, he rated his pain on a 2013 questionnaire as a three out of ten. AR 16. Although he reported that his pain was moderate, he stated that he did not change his daily routine even though it caused him some pain. AR 16. He also reported that he can lift light to medium weighs if they are conveniently placed. AR 16. He said that his pain does not have any significant effect on his social life, including his ability to travel. AR 16-17. He further stated that his pain was "definitely getting better," and only experienced mild pain during the prior four weeks and that he was as healthy as anyone he knew. AR 17.

The ALJ also considered the medical opinion testimony. She assigned the opinion of Dr. Matthews, Plaintiff's treating spinal surgeon in 2013, limited weight regarding claimant's functional abilities before his last insured date because Dr. Matthews did not begin treating Plaintiff until April 2013. AR 17. She also considered the opinion of Dr. Stone, who treated Plaintiff beginning in 2010. AR 17. She assigned Dr. Stone's opinion limited weight for several reasons, including that he only saw Plaintiff four times after 2010, the opinion is inconsistent with the medical records that indicate that Plaintiff had no treatment for his back from 2004 to 2013, and it appeared that the opinion was not based on the time period prior to the date last insured. AR 18. The ALJ also considered the opinions of the state agency through Dr. Tambellini and Dr.

11

Crowhurst that he was not disabled, noting that they failed to provide an assessment of Plaintiff's residual functional capacity, but assigned them no weight because Plaintiff's reported pain in his left leg supported the limitations of pushing and pulling. AR 18.

Finally, the ALJ also considered the written statement of Plaintiff's wife, Deborah Luhr, about Plaintiff's condition. AR 18. Mrs. Luhr reported that Plaintiff has issues bending, picking up items, and stretching. AR 18. She also noted that Plaintiff can experience pain for up to a week after engaging in activities like sweeping. AR 18. Still, she acknowledged that Plaintiff is still able to take part in activities such as kayaking and small hikes. AR 18. The ALJ noted that Plaintiff corroborated that he still engages in those types of activities when he reported to Dr. Matthews in April 2013 that he still kayaks and fishes. AR 18. The ALJ also stated that she did not address the time period prior to the date last insured. AR 18.

Based on the RFC assessment of medium work with some limitations, the ALJ determined that Plaintiff was capable of performing his past relevant work as a sheet metal worker, and that this work did not require the performance of work-related activities that are precluded by the RFC assessment. AR 18.

## II.     LEGAL STANDARD

This Court has the authority to review the Commissioner's decision to deny benefits. 42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). Substantial evidence is defined as relevant evidence that a reasonable person might accept as adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance." Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.1997). Reasoning not relied upon by the ALJ cannot be relied upon to affirm the ALJ's decision. See Cequerra v. Sec'y, 933 F.2d 735, 738.

To determine whether the ALJ's decision is supported by substantial evidence, courts review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995.) If the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's conclusion. Id. at 1030-40. The trier of fact, not the reviewing court, must resolve conflicting

evidence, and if the evidence can support either outcome, the reviewing court may not substitute its judgment for the judgment of the ALJ.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir.1992).  An ALJ's decision will not be reversed for harmless error.  Id.; see also Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991).

### A.      Definition of Disability

In order to qualify for disability insurance benefits, a plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration ("SSA") utilizes a five-step sequential evaluation process in making a determination of disability.  20 C.F.R. § 404.1520; see Reddick, 157 F.3d 715, 721.  If the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the determination and does not go on to the next step; if the determination cannot be made, then the SSA moves on to the next step.  20 C.F.R. § 404.1520.

### B.      Determination of Disability

First, the SSA looks to the claimant's work activity, if any; if the claimant is engaging in substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(I).  Second, the SSA considers the severity of impairments; the claimant must show that he has a severe medically determinable physical or mental impairment (or combination of severe impairments) which has which has lasted or is expected to last twelve months or end in death.  20 C.F.R. § 404.1520(a)(4)(ii).  Third, the SSA considers whether a claimant's impairments meet or equal a listing in 20 C.F.R. Part 404 Appendix 1.  If so, the claimant is deemed disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, the SSA considers the claimant's residual functional capacity ("RFC") and past relevant work.  If the claimant can still engage in past relevant work, he is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth, the SSA considers whether, in light of the claimant's RFC and age, education, and work experience, the claimant is able to make an adjustment to another occupation in the national economy; if so, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).  The claimant bears the burden on steps one

through four. <u>Reddick</u>, 157 F.3d at 721. If a claimant establishes an inability to perform her prior work at step four, the burden shifts to the SSA to show that the claimant can perform other substantial work that exists in the national economy at step five. <u>Id.</u>

### III. DISCUSSION

Plaintiff contends that the ALJ erred in five separate ways in the manner in which she reached her determination that Plaintiff was not disabled. The Court addresses each argument in turn.

### A. ALJ's Identification of Plaintiff's Severe Impairments

Plaintiff contends that the ALJ's determination that he only had one severe impairment at Step 2 -- status post lumbar fusion -- was error. He argues that she failed to include Plaintiff's heart disease, tinnitus, diverticulosis, and additional generalized "pain" and "spinal impairments" as severe impairments.

As Defendant points out, this argument should fail because any error that resulted from her failure to identify all severe impairments was harmless. After making her determination at Step 2, the ALJ continued with the sequential evaluation. In doing so, she expressly considered "all of [Plaintiff's] impairments, including impairments that are not severe." AR 12 (citing 20 C.F.R. §§ 404.1520(e) and 404.1545; SSR 96-8p). Because she continued the disability evaluation and considered *all* of Plaintiff's impairments, whether severe or not, her failure to identify all of his severe impairments at Step 2 is harmless. <u>See</u> <u>Pederson v. Comm'r Soc. Sec. Admin.</u>, 405 Fed. App'x 117, 119 (9th Cir. 2010) ("the ALJ's step 2 determination made no practical difference because the ALJ did not stop after step 2, as other impairments were found severe"). She continued to assess Plaintiff for disability beyond Step 2, so any error was harmless.

Moreover, Defendant makes a persuasive argument that the ALJ's Step 2 determination was proper and supported by substantial evidence, so it was not made in error. A "severe" impairment is one that "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A condition is considered "not severe" when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §

404.1522. With respect to tinnitus and diverticulosis, Plaintiff did not allege disability on the basis of tinnitus and diverticulosis, he provided no testimony about these alleged impairments at the hearing, and he does not identify any medical evidence supporting limitations as a result of those conditions. Plaintiff only cites two records that mention either tinnitus or diverticulosis. The tinnitus record is a March 1, 2011, audiological evaluation, which occurred outside of the relevant time period, and does not establish functional limitations. AR 338. The evaluation notes that Plaintiff has complained of ringing in his years for 2-3 years, with the left side being worse. AR 338. It also notes difficulty watching television, but in his word recognition evaluation he achieved 100% in both ears on all tested levels. AR 338. The diverticulosis document reflects "mild-severity" diverticulosis. AR 306-07. The treating doctor's recommendations were that Plaintiff should follow a high-fiber diet, follow up with an endoscopist as needed, follow up with the treating doctor in three months, and conduct a screening for colon cancer in ten years. AR 306-07. Neither of these documents support the conclusion that Plaintiff was "significantly limit[ed]" by this conditions in his ability to do work.

Plaintiff had a heart attack in 2000 and was diagnosed by Dr. Anton with arteriosclerotic heart disease in that year. Dr. Hunter treated him for coronary heart disease and left heart catheterization, and he was also treated by Dr. Fraser for carotid artery disease. However, when asked by the ALJ at hearing if he had any heart-related symptoms, Plaintiff testified, "I would say symptoms, no." AR 15, 44. Consistent with this testimony, Dr. Hunter noted on October 27, 2009 that he was "[a]symptomatic with good exercise capacity" and his hypercholesterolemia was in "[e]xcellent control." AR 278-79. Dr. Hunter ordered a vascular study done of the carotid arteries, but otherwise ordered him to return in a year for a re-evaluation. AR 279. Plaintiff alleges that his heart disease causes limitation on his ability to work because it causes fatigue requiring frequent rest which is "commonly associated with heart disease," but Plaintiff provides no medical evidence relating any claim of fatigue to his heart disease. Moreover, Plaintiff's theory that his heart disease was a severe impairment is inconsistent with the fact that Plaintiff continued to work for four more years after his 2000 heart attack and related surgery, apparently without further difficulty caused by his heart disease.

Plaintiff's argument that the ALJ erred in not determining that his leg pain was severe limitation is not well taken because pain is a symptom, not a medically determinable impairment. See 20 C.F.R. § 404.1529 ("[S]ymptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."); SSR 95-5p ("Symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, are the individual's own description of the effects of a physical or mental impairment(s)."); SSR 96-4p ("A 'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by itself can establish the existence of such an impairment.'"); see also In re Heckler, 751 F.2d 954, 955 n.1 (8th Cir. 1984) ("pain is a symptom, not an impairment"). Finally, his vague claim that the ALJ should have considered his additional "spinal impairments" is difficult to evaluate. To support this argument, Plaintiff merely mentions that he was seen by Dr. Stone for spinal stenosis at L4-5, without demonstrating any functional limitations that arose from that condition. He fails to demonstrate how these other spinal impairments, beside the one that was found to be a severe impairment, affected his ability to perform basic work activities. Thus, the ALJ did not err in determining that these conditions were severe impairments at Step 2.

**B.     ALJ's Treatment of the Opinions of Plaintiff's Treating Physicians**

The ALJ assigned limited weight to the medical opinions of two of Plaintiff's treating physicians, Drs. Stone and Matthews. Plaintiff contends that this constituted error because their opinions were uncontroverted and the ALJ failed to provide the requisite "clear and convincing reasons" for discounting their uncontroverted opinions.

The Ninth Circuit employs a hierarchy with respect to the weight that the ALJ is to give medical opinions. Specifically, it "distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id. "To reject [the] uncontradicted opinion of a treating or

examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Ryan v. Comm'r of Soc. Sec. Admin, 528 F.3d 1194, 1198 (9th Cir. 2008). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id.

Defendant contends that it is incorrect to characterize Dr. Matthews' and Dr. Stone's opinions as uncontroverted because their opinions indicated some disagreement between them as to whether Plaintiff used or needed to use a cane. This is an insufficient reason for finding that the doctors' opinions were controverted for at least two reasons. Regardless of whether he needed to use a cane or not, both came to the independent conclusion that he was disabled as a result of his spinal condition. Defendant also points to Dr. Matthews' post-operative notes in which he did not respond to the section giving boxes to check as to whether Plaintiff needed to use an assistive device to ambulate. AR 615. The failure to complete a section of a form does not necessarily contradict his later statement in his November 2013 opinion that Plaintiff walks with a cane at all times, a statement that was made after Plaintiff's recovery had further progressed. AR 617. Moreover, Dr. Matthews' statement that Plaintiff *uses* a cane at all times is not in direct conflict with Dr. Stone's opinion that Plaintiff does not *need to use* a cane. AR 620. One statement is an observation while the other is an opinion. Therefore, these medical providers' opinions were not controverted, and the "clear and convincing reasons" standard applies in reviewing the ALJ's treatment of their opinions.

### 1.    Dr. Matthews

The ALJ expressly considered Dr. Matthews' November 8, 2013 opinion about Plaintiff's total disability and functional limitations and assigned it limited weight. Her reasons for doing so were that Dr. Matthews did not begin treating Plaintiff until April 2013, so his opinion from November 2013 was not relevant to determining whether Plaintiff was disabled at any time in 2009 or 2010. AR 17. Plaintiff contends this was error because his opinion was entitled to retrospective effect and the 2013 treatment was relevant to a determination of an earlier disability.

The ALJ had good reason to give his opinion little weight. The Ninth Circuit has affirmed

17

the rejection of treating medical providers' opinions that were rendered at times less remote than the three years at issue here. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (one year); Lombardo v. Schweiker, 749 F.2d 565, 567 (9th Cir. 1984) (one and a half years); Lair-Del Rio v. Astrue, 380 Fed. App'x 694, 695-96 (9th Cir. 2010) (concluding that medical providers' opinions that were "written months and years after the relevant time period, are unpersuasive"). Importantly, there is no indication that he intended to provide a retroactive opinion or that he had any basis for doing so. See Watkins v. Astrue, 357 Fed. App'x 784, 786 (9th Cir. 2009) (ALJ properly rejected a treating physician's questionnaire opinion, in part, because it was offered after the last insured date and the "questionnaire is written in the present tense" and "made no indication" that the opinion was retroactive). Dr. Matthews' November 8, 2013 opinion states that Plaintiff has had "persistent back pain and leg pain since the spinal fusion" that he performed in April 2013 after Plaintiff's new injury that year, suggesting that his opinion is limited to consideration of those recent symptoms and does not take into account Plaintiff's condition in 2009 or 2010.[1]

### 2.    Dr. Stone

Plaintiff also argues that the ALJ erred in assigning limited weight to the opinion of Dr. Stone, Plaintiff's treating physician from February 2010 until at least December 2013. Dr. Stone assessed functional limitations that were far more restrictive than those imposed in the ALJ's RFC assessment. Thus, Plaintiff argues that if Dr. Stone's opinion was given proper weight, the ALJ would have been compelled to find that he was disabled.

The ALJ assigned Dr. Stone's opinion limited weight for several reasons: (1) that he only

---

[1] Defendant's argument that Dr. Matthews' opinion is contradicted by his earlier assessment of Plaintiff is not persuasive. In July 2013, Dr. Matthews provided a statement that Plaintiff's recovery was good and he expected his symptoms to resolve in approximately six months. Then, in November 2013, Dr. Matthews wrote his opinion that Plaintiff was not likely to see any better resolution of his pain and overall condition. To start, the ALJ did not state that this was part of the basis for discounting Dr. Matthews' opinion, so it is not proper for the Court to consider this reason in its review of the ALJ's decision, as it must focus on the reasons the ALJ actually provided. Moreover, it is a reasonable to conclude that Dr. Matthews continued to follow Plaintiff's condition in those intervening four months and determined that he had been too optimistic and Plaintiff was not likely to make any further progress. In isolation, this is not an adequate reason to discount his opinion.

saw Plaintiff four times starting in February 2010, as stated in Dr. Stone's opinion; (2) the opinion is inconsistent with the medical records that indicate that Plaintiff received no treatment for his back from 2004 to 2013; and (3) it appeared that the opinion was based on evidence after the date last insured. AR 18.

While Dr. Stone's opinion was written several years after the relevant time period, unlike Dr. Matthews, he specifically stated that his opinion was based on his treatment of Plaintiff in 2010 during the relevant time period. The ALJ's position that his opinion "appear[ed]" to be based on an examination of Plaintiff in 2013 at the time he wrote it is not accurate.

At the same time, the ALJ did not err in considering whether Dr. Stone's opinion that Plaintiff had considerable limitations was inconsistent with the very minimal evidence that Plaintiff sought treatment after his 2004 back surgery, evidence that consisted only of Plaintiff's self report that he saw a doctor about once a year for his back and leg pain and went to the emergency room an unspecified number of times. In addition to the lack of medical records in the administrative record from Plaintiff's treating physicians, there are no records from Dr. Stone documenting his treatment of Plaintiff's back and leg pain, aside from the December 24, 2013 assessment about his condition and alleged disability.

With respect to retroactivity back to 2004, Dr. Stone stated that his opinion was retroactive to that date and Plaintiff contends in his brief that Dr. Stone's opinion was based on Plaintiff's medical records from 2004 to 2010. However, Dr. Stone's opinion does not state that it was based on a review of Plaintiff's earlier medical records. Indeed, if it had been and Dr. Stone had access to those records, there should have been no difficulty in obtaining them as evidence to support Plaintiff's application for disability benefits. Because Dr. Stone treated Plaintiff in 2010 during the relevant time period, however, the question of retroactivity is not critical to considering whether it was proper to discount his opinion.

Finally, Plaintiff contends that Dr. Stone's diagnoses and opinions are consistent with classic degenerative back disease that progresses over time and, in this case, worsened between his first and second back surgeries. MRI studies from 2013 indicated that Plaintiff had degenerative back disease and Dr. Matthews diagnosed Plaintiff with the condition. However, Dr. Matthews'

diagnosis and the related MRI studies only indicate that he had degenerative back disease as of 2013. There was no medical testimony in the administrative record about degenerative back disease or how it may have progressed in Plaintiff's case. While it is likely that such a degenerative disease began to develop before 2013, it is impossible to tell from the 2013 records when that condition started or began causing disabling side effects and whether Plaintiff was disabled in 2009 or 2010 as a result of the condition.

Plaintiff argues that the ALJ's reasons should not be credited as "clear and convincing" reasons because she mistakenly explained that Dr. Stone only saw Plaintiff four times after his first visit with Plaintiff on February 16, 2010. Plaintiff points to records in the administrative record that indicate that Plaintiff visited Dr. Stone at least twenty times between 2012 and 2014. As Defendant accurately points out, however, those twenty visits were not related to Plaintiff's alleged back and leg pain. Further, the ALJ relied on Dr. Stone's own answer -- four visits -- to a question about the frequency of his contacts with Plaintiff "concerning [his] impairments." AR 618. Thus, the additional twenty visits are immaterial to the issue of whether Dr. Stone had an adequate basis for making his disability determination as set forth in his December 2013 opinion. The ALJ gave no basis for discounting an opinion about a patient's condition in the course of four visits over less than three years.

Considering all of these issues, the ALJ's reasons for assigning Dr. Stone's opinion little weight did not meet the clear and convincing standard. Her error in weighing his opinion cannot be described as harmless because the VE testified that a hypothetical person with the limitations described in Dr. Stone's opinion could not perform Plaintiff's past relevant work or any work in the national economy, as assigning it full weight would require a limitation that he would be absent from work at least four times a month.

### 3.    Dr. Larocque

In his opening brief, Plaintiff explained that Alan Larocque, M.D., a radiologist who reviewed his MRI scan on February 8, 2013, concluded that Plaintiff had severe acquired spinal stenosis at L4-5, post-surgical changes consistent with partial left hemilaminectomy at L5-S1, and facet arthropathy at L3-4, L405, and L5-S1 levels. AR 360-66. In his analysis, Dr. Larocque

stated that the clinical record did not address laterality or nerve root distribution of concern.  AR 365.

Although Plaintiff very generally summarized this evidence in his opening brief and noted that the ALJ's opinion did not discuss Dr. Larocque's opinion, he waited until his reply brief to argue that it was error for the ALJ to fail to consider Dr. Larocque's opinions as a treating physician.  Arguments raised for the first time on reply are generally waived.  See, e.g., Murchison v. Colvin, 2016 WL 6652693, at *7 n.8 (C.D. Cal. Nov. 10, 2016); Polion v. Colvin, 2013 WL 3527125, at *2 n.4, *7 n.7 (C.D. Cal. July 10, 2013); Thacker v. Comm'r of Soc. Sec. Admin., 2012 WL 1978701, at *11-12 (E.D. Cal. June 1, 2012).  Because Plaintiff did not sufficiently raise this issue until his reply brief, he has waived it.

Even if the Court were to consider it, however, the ALJ did not err in failing to consider Dr. Larocque's opinion, as it suffers from the same deficiencies as Dr. Matthews' opinion.  The opinion was rendered in 2013, several years after Plaintiff's last insured date.  There is no indication in the opinion that Dr. Larocque analyzed any information about Plaintiff aside from the MRI scan taken in February 2013.  The MRI may have shown injuries or a worsening condition that could have also existed as long ago as 2009 or 2010, but could have also been more recent.  Dr. Larocque did not state that the condition also existed in 2009 or 2010.  There are no MRIs from the relevant time period.  Based on the medical record, there is no basis for concluding that this 2013 opinion applied at all to Plaintiff's condition in 2009 and 2010.

## C.    ALJ's Development of the Record

Plaintiff argues that the ALJ violated her duty to fully develop the record in this case because she did not have medical evidence about the limiting effect of Plaintiff's right leg pain on his RFC assessment.  He also seems to argue generally that the ALJ's RFC assessment was erroneous because she discounted Dr. Stone's medical opinion and, therefore, the RFC assessment was not based on medical evidence.

The ALJ has an "independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'"  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)).  "Ambiguous evidence, or

the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" Id. (quoting Smolen, 80 F.3d at 1288)).  Some options for carrying out this duty include "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

As to the first argument, it is unclear on what basis Plaintiff claims that the ALJ's duty to develop the record was triggered for right leg pain.  There is no evidence in the record indicating that Plaintiff complained of or was ever treated for right leg pain, in contrast to his left leg.  In support of his argument, Plaintiff merely cited to the entire hearing transcript and medical record (AR 24-61, 222-687), and does not point to any specific evidence that Plaintiff had symptoms of pain in his right leg at any time.  Thus, there was no basis for seeking additional evidence of any kind for this alleged impairment.

Plaintiff also argues that, after dismissing the opinion of Dr. Stone, the ALJ was obligated to seek a medical opinion or else her RCF assessment was without any basis in the medical record.  First, this argument is belied by the fact that the ALJ expressly relied upon the medical record provided, which Plaintiff has not argued is incomplete except for medical records that allegedly could not be obtained because they were destroyed.  The ALJ discounted Dr. Stone's medical opinion because she determined that it was not adequately based on Plaintiff's medical condition during the relevant period between 2009 and 2010.  It is unclear how the ALJ could have developed a record more fully with respect to Plaintiff's condition during that time period when no contemporaneous medical records exist and, at the time of the hearing, an examining physician could not examine Plaintiff in person to determine what his condition had been in 2009 and 2010.  Indeed, the two independent state examiners (Drs. Tambellini and Crowhurst) noted that they could not make a proper disability determination because of the incomplete record, which is impossible to supplement in light of the alleged destruction of Plaintiff's medical records.  AR 67, 76.  Accordingly, the ALJ did not abdicate her duty to fully and fairly develop the record in the course of making her determination that Plaintiff is not disabled.

### D.    ALJ's Credibility Determination

In order to find a claimant's testimony regarding symptoms unreliable, the ALJ is "required to make 'a credibility determination with findings sufficiently specific to permit the courts to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)).  The ALJ must conduct a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)) (internal citations omitted).

If the claimant has presented evidence to satisfy the first step "and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so.'"  Garrison, 759 F.3d at 1014-15 (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)).  The ALJ may consider many factors when weighing the claimant's credibility, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'"  Garrison, 759 F.3d at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin, 278 F.3d 920, 924 (9th Cir. 2002)).

The ALJ credited Plaintiff's overall pain complaints, but found that his statements about the intensity, persistence, and limiting effects of those symptoms were not entirely credible for reasons set forth in her decision.  AR 15-17.  Therefore, the ALJ was obligated to provide "clear and convincing reasons" for concluding that his complaints were not entirely credible.  See Garrison, 759 F.3d at 1014-15.  Her negative credibility determination rested on several bases: (1)

his alleged pain symptoms during the relevant period were not supported by the medical record, as it was almost completely bereft of any medical records showing that he sought treatment for the alleged pain and his testimony indicated that he did not seek such treatment; (2) after 2004, he only sought treatment again in 2013 after injuring his back moving a wood log; (3) after his 2013 surgery Plaintiff reported that his pain was much relieved and post-operative diagnostic tests showed that his condition was stable; (4) Plaintiff's treatment, aside from the surgeries, was relatively conservative for pain management, as he has only been prescribed three medications for pain and muscle spasms, he avoids taking the medication for extreme pain, and he has sought limited physical therapy; and (5) his complaints of severe pain are inconsistent with other statements in the record that his pain does not significantly affect his social life and daily routine.

Plaintiff contends that these reasons are not clear and convincing because she failed to specifically identify the testimony she found incredible and the record evidence that undermines that testimony. He also argues that her reasons were "less than candid" because she misconstrued his testimony when she said that he did not seek medical treatment between 2004 and 2013.

The ALJ provided specific analysis of the testimony she discredited and the reasons for doing so. She discussed in detail the nearly half dozen reasons she discredited his complaints about the severity of his pain symptoms. While Plaintiff is correct that he did not testify that he sought no treatment of his back and leg pain from 2004 and 2013, Plaintiff testified only vaguely that he sought treatment for his back once a year from Drs. Olson, Biggert, and unnamed physicians at Santa Rosa Memorial between 2004 and 2010. AR 32-33. The ALJ was also correct that the administrative record contains very few documents about his alleged back and leg pain, aside from the records relating to his first back surgery in 2004 and Dr. Stone's single opinion from 2013. Although it was not Plaintiff's fault if medical records were destroyed by Dr. Eichbaum, that does not account for the missing records from the other doctors he saw between 2004 and 2010.

Plaintiff also argues that her reliance on the two 2013 questionnaires he completed about his condition after his second surgery was irrelevant to the 2009 and 2010 time period and cannot be used to discredit his testimony. This argument is inconsistent with Plaintiff's repeated reliance

24

United States District Court
Northern District of California

on evidence from the 2013 time period to support his claim for benefits for the 2009 and 2010 time period. Moreover, the ALJ stated generally that his alleged symptoms were inconsistent with his statements in the overall medical record, taking the questionnaires that Plaintiff filled out in July of 2013 as one example. In that questionnaire, Plaintiff indicated that his physical activities involved kayaking, taking small hikes, fishing, cooking, washing dishes, doing laundry, watering his yard, and grocery shopping. AR 172-774, 625-28. The ALJ may take a claimant's activities of daily living into account when assessing credibility, see Tommasetti, 533 F.3d at 1039, although they do not automatically translate into the ability to perform substantial gainful activity.

One of the ALJ's other stated reasons for discrediting Plaintiff's testimony was based on his answer in one of the July 2013 questionnaires that he takes three medications -- one for spasms (Methocarbamol), one for average pain (Oxycodone), and one for extreme pain (morphine) -- but tries not to take the morphine. There are numerous legitimate reasons why a person might try to not take potent pain-relieving medications such as morphine, including serious side effects and the risk of abuse or addiction. The ALJ did not question Plaintiff about his reasons for avoiding taking this medication and, therefore, she has established no persuasive reason for discounting his testimony on this basis. Moreover, there is no indication that Plaintiff was prescribed those medications during the relevant period. In fact, Plaintiff testified at the hearing to taking four different medications (Neurontin, Elavil, Valium, and Toradol) after his first back surgery.

Her other reasons for making a negative credibility determination against Plaintiff are clear and convincing. For example, she noted Plaintiff's relatively conservative treatment for pain after the 2004 surgery and until his second surgery in 2013 was triggered when he re-injured himself moving a wood log. This is a proper reason. See Edginton v. Colvin, 625 Fed. App'x 334, 336 (9th Cir. 2015) (treatment that was "routine and conservative" undermined the claimant's allegations of disabling limitations). Although he testified that he sought treatment at least once annually from his primary care physician between 2004 and 2010 for his back and leg pain, there was no testimony and nothing in the medical record to suggest that he sought additional physical therapy or consultation with a specialist or any testimony or records that describe what symptoms he reported and the treatment he received during that time. Taking all of the factors together, the

25

ALJ's negative credibility assessment of Plaintiff's pain complaints was not made in error because she providing specific clear and convincing reasons for her determination.

### E.     Vocational Expert Testimony about Plaintiff's Use of a Cane

Finally, Plaintiff argues that the ALJ erred by not obtaining vocational expert testimony about the impact of Plaintiff's use of a cane on his ability to perform his work.  Essentially, Plaintiff seems to argue that it was error to rely on an RFC assessment that did not include the use of a cane as a limitation.

VE testimony may be relied upon without error when it addresses hypotheticals that contain the limitations that are supported by substantial evidence.  See Copeland v. Bowen, 861 F.2d 536, 540 (9th Cir. 1988) (the ALJ does not need to present rejected limitations to the vocational expert).  Plaintiff does not argue that the hypotheticals posed to the vocational expert did not accurately capture the ALJ's assessment of Plaintiff's RFC.  Contrary to Plaintiff's assertion, there is nothing in the ALJ's opinion that states that she accepted his testimony that he relied upon a cane from 2004 to the time of the hearing.  The ALJ's RFC was developed to capture Plaintiff's ability to work through the last date insured.  AR 14.  There was no evidence in the record to support a finding that Plaintiff needed the use of the cane in 2009 and 2010.  The only evidence in the record to that effect was the opinion of Dr. Matthews regarding his use of the cane in 2013, which the ALJ did not err in assigning little weight, and Plaintiff's own testimony, which the ALJ properly discounted.  In addition, Dr. Stone, the other substantial medical professional whose opinion supports Plaintiff's claimed disability in 2009 and 2010, checked a box stating that Plaintiff does not need to use a cane or other assistive device when engaging in occasional standing or walking.  On this record, the ALJ's decision to exclude a limitation based on Plaintiff's use of a cane from her RFC assessment was supported by substantial evidence in the record.  Accordingly, the ALJ did not err by not obtaining vocational expert testimony about Plaintiff's use of a cane.

### F.     Whether to Remand or Award Benefits

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court."  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir.

1   1987). "[I]f additional proceedings can remedy defects in the original administrative proceeding,

2   a social security case should be remanded" for further proceedings." Garrison v. Colvin, 759 F.3d

3   995, 1019 (9th Cir. 2014). However, a court may also reverse and remand with instructions to

4   calculate and award benefits "when it is clear from the record that a claimant is entitled to

5   benefits." Id.

6          Here, it is appropriate to remand this case for further proceedings so that the ALJ can re-

7   assess the proper weight that should be given to Dr. Stone's December 24, 2013 opinion and

8   assess the impact of the limitations contained in his opinion on the ALJ's overall RFC assessment

9   and disability determination. Dr. Stone's opinion might not be entitled to full weight, based on the

10  issues discussed above, although the ALJ must make that determination in the first instance.

11  There is enough properly discounted evidence in the record that makes a disability determination

12  inappropriate at this time because even if Dr. Stone's opinion were to be fully credited as true it is

13  not clear from the record that Plaintiff is entitled to benefits. Moreover, the ALJ may consider

14  whether there is any medical evidence that Plaintiff's degenerative disc disease, which was

15  diagnosed in 2013, limited his ability to work during the period before his last insured date.

16  **IV.   CONCLUSION**

17         Having concluded that the ALJ committed error in denying Plaintiff's application for

18  disability benefits by assigning limited weight to the opinion of Dr. Stone, and that further

19  proceedings are necessary to consider how the limitations noted in Dr. Stone's opinion impact the

20  RFC assessment for Plaintiff, the Court GRANTS Plaintiff's motion for summary judgment,

21  DENIES Defendant's motion for summary judgment, and remands for further proceedings

22  consistent with this order.

23

24         **IT IS SO ORDERED.**

25  Dated: March 29, 2018

26

27

    ELIZABETH D. LAPORTE
28  United States Magistrate Judge